# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

JOSEPH CHAMBERS,                )
                                )
        Petitioner,             )
                                )
    v.                          )   Civil Action No. 09-892-GMS
                                )
PERRY PHELPS, Warden, and       )
ATTORNEY GENERAL OF             )
THE STATE OF DELAWARE,          )
                                )
        Respondents.            )

---

Joseph Chambers. *Pro se* petitioner.

Gregory E. Smith, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware.  Counsel for Respondents.

---

## MEMORANDUM OPINION

_Nov 14_____, 2012
Wilmington, Delaware

Sleet, Chief Judge

Pending before the court is a petition for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254 filed by petitioner Joseph Chambers ("Chambers"). (D.I. 1)  For the reasons discussed,

the court will deny the petition.

## I. FACTUAL AND PROCEDURAL BACKGROUND

As set forth by the Delaware Supreme Court in *Chambers v. State*, 930 A.2d 904, 906-07

(Del. 2007):

> On April 27, 2003, Gregory Graves, a resident of Simonds Gardens in New Castle, was shot multiple times. His body was found several hours later by William Butler. Butler discovered Graves' body in the alley between Rosegate and Simonds Gardens, and called the police and emergency services through 911.
>
> Butler told police that both he and his wife had been sleeping when they heard gunshots in the early morning hours of April 27, 2003. They ignored them, however, and went back to sleep. During the course of the police investigation, officers spoke to another witness, Benita Evans. Evans told the police that she witnessed an argument between Chambers and Graves. Evans knew Graves and described him as a good friend, someone she could go to if she needed anything, including money or drugs. Evans also recognized Chambers from the neighborhood.
>
> On the night Graves was shot, Evans had been partying with drugs and alcohol. She was on her way to a local liquor store when she saw Chambers and Graves arguing. Evans was approximately fifteen feet away. Although Graves and Chambers were not loud, she could tell they were arguing "because of their hands, language and body movement." Both Chambers and Graves were gone by the time Evans left the liquor store.
>
> After returning to her house, Evans heard Graves' voice. She looked out of a window and saw Graves in the common area outside her building. She remembers this being at approximately 3:00 a.m. Evans went outside and asked if he could get her some cocaine. He said no and indicated that he was waiting for someone. Evans then saw Graves walk towards the alley leading to the park. A few minutes later, Evans saw Chambers follow Graves into the same alley.
>
> Officers also learned that Quinton Davis had been out during the general time of the shooting. Davis was a resident of 117 Rose Avenue in the Rosegate neighborhood of New Castle. Investigators spoke with Davis who told several different stories about the

1

night that Graves was shot. Initially, Davis told investigators that he was at a motel the night of the shooting. He later changed his story and told investigators that he was with Chambers, whom he knew as "Bookie," and Daniel Haye the night Graves was shot.

According to Davis, on April 27, 2003, at around 3:00 a.m., he was sitting with Chambers and Haye, in Haye's car, near Chambers' residence. Chambers left the car and walked past a few houses on the street. He then returned to the car and told Davis and Haye that he had something to do in one of the houses. Chambers instructed Davis and Haye to meet him in Simonds Garden, by the path. Davis did not know what Chambers had to do in the house. Before driving to Simonds Gardens, Davis got into the passenger seat of Haye's car. The two then drove to wait for Chambers.

Several minutes later, Chambers met them at the car. He was "walking fast" and "breathing kind of heavy." Chambers got into the back seat of Haye's car. He told Davis and Haye that they all needed to get out of the area because he had just shot Graves.

Haye drove to Philadelphia. On the way to Philadelphia, Chambers rolled the window down and back up once. Haye told investigators that he "heard something thrown out of the window" and specifically indicated that a "gun was tossed out of the car in Chambers' black hooded sweatshirt along I95 near Philadelphia."

*Id.*

On May 26, 2003, New Castle County Police arrested Chambers. He was later indicted on the following charges: first degree murder; possession of a firearm during the commission of a felony ("PFDCF"); and possession of a deadly weapon by a person prohibited ("PDWBPP"). In March 2005, a Superior Court jury found Chambers guilty of all charges. The Superior Court sentenced him to life in prison for the murder conviction, ten years at Level V for the PFDCF conviction, and five years at Level V on the PDWBPP conviction. Chambers appealed, and the Delaware Supreme Court affirmed his convictions and sentence. *Chambers*, 930 A.2d at 904.

In May 2008, Chambers filed a motion for post-conviction relief under Delaware Superior Court Criminal Rule 61 ("Rule 61 motion"). The Superior Court denied the Rule 61 motion, and the Delaware Supreme Court affirmed that decision. *See State v. Chambers*, 2008

2

WL 5206772 (Del. Super. Ct. Dec. 8, 2008);  *Chambers v. State*, 985 A.2d 389 (Table), 2009

WL 3790556 (Del. Nov. 12, 2009).

## II. GOVERNING LEGAL PRINCIPLES

### A. The Antiterrorism and Effective Death Penalty Act of 1996

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

"to reduce delays in the execution of state and federal criminal sentences . . . and to further the

principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003).

Pursuant to AEDPA, a federal court may consider a habeas petition filed by a state prisoner only

"on the ground that he is in custody in violation of the Constitution or laws or treaties of the

United States." 28 U.S.C. § 2254(a).  AEDPA imposes procedural requirements and standards

for analyzing the merits of a habeas petition in order to "prevent federal habeas 'retrials' and to

ensure that state-court convictions are given effect to the extent possible under law." *Bell v.*

*Cone*, 535 U.S. 685, 693 (2002).

### B. Exhaustion and Procedural Default

Absent exceptional circumstances, a federal court cannot grant habeas relief unless the

petitioner has exhausted all means of available relief under state law.  28 U.S.C. § 2254(b);

*O'Sullivan v. Boerckel*, 526 U.S. 838, 842-44 (1999);  *Picard v. Connor*, 404 U.S. 270, 275

(1971).  AEDPA states, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to
> the judgment of a State court shall not be granted unless it appears that –
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(i)  there is an absence of available State corrective process; or
>    (ii) circumstances exist that render such process ineffective to protect the rights of the

applicant.

28 U.S.C. § 2254(b)(1).

The exhaustion requirement is based on principles of comity, requiring a petitioner to give "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 844-45; *Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000). A petitioner satisfies the exhaustion requirement by demonstrating that the habeas claims were "fairly presented" to the state's highest court, either on direct appeal or in a post-conviction proceeding. *See Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997); *Coverdale v. Snyder*, 2000 WL 1897290, at *2 (D. Del. Dec. 22, 2000). "Fair presentation of a claim means that the petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." *Holloway v. Horn*, 355 F.3d 707, 714 (3d Cir. 2004). A federal legal claim is "fairly presented" to state courts when there is: (1) reliance in the state courts on pertinent federal cases employing constitutional analysis; (2) reliance on state cases employing constitutional analysis in like fact situations; (3) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution; and (4) allegation of a pattern of facts that is well within the mainstream of constitutional litigation. *See McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999).

A petitioner's failure to exhaust state remedies will be excused if state procedural rules preclude him from seeking further relief in state courts. *Lines v. Larkins,* 208 F.3d 153, 160 (3d Cir. 2000); *see Teague v. Lane,* 489 U.S. 288, 297-98 (1989). Although treated as technically exhausted, such claims are nonetheless procedurally defaulted. *Lines,* 208 F.3d at 160; *Coleman*

4

*v. Thompson*, 501 U.S. 722, 750-51 (1991). Similarly, if a petitioner presents a habeas claim to the state's highest court, but that court "clearly and expressly" refuses to review the merits of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted. *See Coleman*, 501 U.S. at 750; *Harris v. Reed*, 489 U.S. 255, 260-64 (1989).

Federal courts may not consider the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims. *McCandless*, 172 F.3d at 260; *Coleman*, 501 U.S. at 750-51. To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, a petitioner must show "that [the errors at trial] worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Alternatively, a federal court may excuse a procedural default if the petitioner demonstrates that failure to review the claim will result in a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Wenger v. Frank*, 266 F.3d 218, 224 (3d Cir. 2001). A petitioner demonstrates a miscarriage of justice by showing a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496. Actual innocence means factual innocence, not legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998). In order to establish actual innocence, the petitioner must present new reliable evidence – not presented at trial – that demonstrates "it is more likely than

not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 537-38 (2005); *Sweger v. Chesney,* 294 F.3d 506, 522-24 (3d Cir. 2002).

### C. Standard of Review

When a state's highest court has adjudicated a federal habeas claim on the merits,[1] the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d). Pursuant to 28 U.S.C. § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the trial. 28 U.S.C. § 2254(d)(1) & (2); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). This deferential standard of § 2254(d) applies even "when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied"; as recently explained by the Supreme Court, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, __ U.S. __, 131 S.Ct. 770, 784-85 (2011).

If the state's highest court has not adjudicated a federal habeas claim on the merits, but the claim is exhausted and the merits are properly before the federal court on habeas review, then the federal court must review the claim *de novo. See Breakiron v. Horn*, 642 F.3d 126, 131 (3d Cir. 2011)(citing *Porter v. McCollum*, 558 U.S. 30 (Jan. 19, 2011)). *De novo* review means that

---

[1] A claim has been "adjudicated on the merits" for the purposes of 28 U.S.C. § 2254(d) if the state court decision finally resolves the claim on the basis of its substance, rather than on a procedural or some other ground. *Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009).

the court "must exercise its independent judgment when deciding both questions of constitutional law and mixed constitutional questions." *Williams*, 529 U.S. at 400 (2000)(O'Connor, J., concurring).

Finally, whether reviewing a habeas claim *de novo* or under § 2254(d), a federal court must presume that the state court's determinations of factual issues are correct. 28 U.S.C. § 2254(e)(1); *Appel*, 250 F.3d at 210. This presumption of correctness applies to both explicit and implicit findings of fact, and is only rebutted by clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003)(stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions).

## III. DISCUSSION

Chambers' timely filed petition asserts the following four grounds for relief: (1) the trial court erred by permitting the chief investigating police officer to speak with a prosecution witness during a brief trial recess; (2) the trial court erred by refusing to instruct the jury on accomplice credibility; (3) the admission of out-of-court statements violated Chambers' rights under the confrontation clause; and (4) prosecutorial misconduct.

### A. Claim One: Detective's Conversation With Witness Violated Chambers' Due Process Rights

During the prosecutor's direct examination of Quinton Davis, Davis explained how he knew Chambers and Haye. Davis then recounted how he had been questioned by the police shortly after the shooting and stated that he lied and told the police what they "wanted to hear so [that they] all would leave [him] alone." (D.I. 12, App. to Appellant's Op. Br. in *Chambers v.*

7

*State*, No.282,2006 at A-14) The prosecutor asked Davis about the last statement he gave to the

police on May 28th, wherein Davis implicated Chambers as the person who killed Graves. Davis

replied that he did not remember making that police statement. The prosecutor asked Davis if he

wanted to be in court testifying, and Davis replied that he did not. *Id.* at A-15. A sidebar

conference was called, during which the prosecutor explained to the trial judge that Davis had

"expressed a fear for the people who are in this courtroom. His brothers still live in the Rosegate

area, and although — I realize you've said I can't ask him, but he is intimidated by these people

who are sitting back there in the courtroom now." *Id.* The judge stated that he would remove the

individuals only if they acted in an intimidating manner. After the sidebar conference, the court

granted the prosecutor's request to ask leading questions. The prosecutor asked Davis about the

different statements he had given to the police, and Davis testified that everything he told the

police was a lie. When asked again about the May 28th police statement, Davis responded that he

did not remember anything. The prosecutor requested a recess. The judge excused the jury. The

prosecutor then informed the judge that Davis wanted to speak with Detective Armstrong, and

asked the court to permit such communication. Defense counsel objected to the conversation

between Detective Armstrong and Davis because the State was in the middle of its direct

examination of Davis. The judge told defense counsel to find support for counsel's assertion

that there was rule prohibiting a trial recess during the direct examination of a witness. The

judge then granted the prosecutor's request for a recess and indicated that the State was free to

confer with its own witness because cross-examination had not yet commenced. *Id.* at A-16 to

A-17. After the recess, defense counsel did not identify a rule prohibiting an adjournment during

the direct examination of a witness. Before the jury returned, Detective Armstrong informed the

8

court about his conversation with Davis. Detective Armstrong described how Davis stated he felt intimidated by some of the people who were in the audience and that, if they left the courtroom, he would retake the stand and "tell the truth." The defense objected to the removal of any audience members. The trial judge overruled the objection and had two people removed from the audience. When Davis resumed his testimony after the recess, he testified consistently with his May 28th police statement. *Id.* at A-18 to A-23.

The next morning, the defense moved for a mistrial. The trial court reserved decision, stating that it would revisit the request at the close of the State's case. After hearing additional argument and discussing the Delaware rules for sequestering witnesses, the judge denied the motion for mistrial, explaining that he "permitted the consultation during trial for what it seemed to [him] was a proper purpose." *Id.* at A-35 to A-37.

On direct appeal, Chambers asserted that the Superior Court erred in denying his motion for mistrial, arguing that the only purpose of the recess was to provide the prosecution with time to rehabilitate the witness. Chambers also asserted that the trial court violated its own sequestration order. The Delaware Supreme Court rejected both assertions. First, the Delaware Supreme Court concluded that there was no record support for Chambers' claim that the sequestration order was violated, because the trial judge knowingly permitted Detective Armstrong to speak with Davis. The Delaware Supreme Court also determined that the State did not use the recess to rehabilitate or coach Davis, explaining that

> Detective Armstrong spoke with Davis at a brief recess during Davis' direct examination. According to Detective Armstrong, his conversation with Davis was not aimed at "controlling or putting a better face on testimonial damage caused by Davis' testimony." Instead, the substance of the conversation, as recounted by Detective Armstrong, concerned the safety of Davis and his family. The State notes that there is support in the record concerning the validity of the perceived threat to Davis' safety. On March 18,

9

2005, the trial judge called counsel to sidebar and explained the presence of extra security within the courtroom.  The basis for the increased security was due to information communicated to the Department of Justice that Davis "was a dead man walking."

*Chambers*, 930 A.2d at 907-08.  The Delaware Supreme Court then affirmed the Superior

Court's denial of Chambers' motion for mistrial, opining that,

> [a] mistrial is appropriate only when there is manifest necessity or the ends of public justice would otherwise be defeated.  Chambers acknowledges that the substance of Davis' "revised" testimony following the recess would have been admissible pursuant to section 3507 of title 11.  Accordingly, Chambers cannot show prejudice from Davis' conversation with Detective Armstrong.

*Id.* at 909.

In claim one of this proceeding, Chambers contends that the trial court erred in granting a

recess during Davis' direct examination, arguing that the prosecutor intended to use the time for

Detective Armstrong to rehabilitate or coach Davis in his testimony.  Reading this claim in

context with the Delaware case cited in the petition, the Delaware Supreme Court's discussion of

this claim in its post-conviction appeal decision that Chambers attached to his petition, and the

federal cases cited by the Delaware Supreme Court in Chambers' direct appeal, the court liberally

construes claim one as alleging that the trial court violated Chambers' due process rights by

rejecting Chambers' "witness coaching" argument and refusing to grant a mistrial.  Thus, the

defining issue is whether the denial of the motion for mistrial deprived Chambers of a fair trial.

*See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Pursuant to clearly established Federal law, a trial court has discretion to grant or deny a

motion for mistrial in the absence of a showing of manifest necessity or that the ends of public

justice would otherwise be defeated.  *United States v. Perez*, 22 U.S. 589, 580 (1824);  *Renico v.

Lett*, 130 S.Ct. 1855, 1863 (2010)("The decision to declare a mistrial is left to the sound

discretion of the judge, but the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes."). The "manifest necessity" standard is variable, and "abjures the application of any mechanical formula." *Illinois v. Somerville*, 410 U.S. 458, 462 (1973). As for the "ends of public justice" standard,

> [a] trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would be reversed on appeal due to an obvious procedural error in the trial. If an error would make reversal on appeal a certainty, it would not serve "the ends of public justice" to require that the Government proceed with its proof when, if it succeeded before the jury, it would automatically be stripped of that success by an appellate court.

*Id.* at 464.

In short, the Supreme Court has, "for the most part, explicitly declined the invitation of litigants to formulate rules based on categories of circumstances which will permit or preclude retrial." *United States v. Jorn*, 400 U.S. 470, 480 (1971). Notably, there is no constitutional prohibition on a trial court's decision to grant a mid-testimony recess during the testimony of prosecution witness, nor is there a constitutional right to the sequestration of witnesses. Rather, trial management issues such as trial recesses and the sequestration of witnesses fall within a trial judge's broad discretion to control a trial. *See Geders v. United States*, 425 U.S. 80, 87 (1976); *Perry v. Leeke*, 488 U.S. 272, 282, 287 (1989). As explained by the Supreme Court,

> a criminal trial does not unfold like a play with actors following a script; there is no scenario and can be none. The trial judge must meet situations as they arise and to do this must have broad power to cope with the complexities and contingencies inherent in the adversary process. To this end, he may determine generally the order in which parties will adduce proof; his determination will be reviewed only for abuse of discretion.

*Geders*, 425 U.S. at 86.

When deciding Chambers' direct appeal, the Delaware Supreme Court correctly identified the "manifest necessity" and "ends of public justice" standards as the governing

11

precedent for determining if a trial court abused its discretion in denying a motion for mistrial. Therefore, the Delaware Supreme Court's decision was not contrary to clearly established Federal law.

The court's inquiry is not over, however, because it must also determine if the Delaware Supreme Court reasonably determined the facts based on the evidence presented at trial and whether its decision involved a reasonable application of clearly established Federal law. Turning first to the Delaware Supreme Court's factual determination and the inquiry under § 2254(d)(2), the court notes that the record in this case does not indicate that the trial court's sequestration order prohibited police-witness contact. In turn, the record clearly demonstrates that Davis asked to speak with Detective Armstrong, not the other way around, and the trial judge granted the brief recess with the knowledge that Detective Armstrong planned to talk with Davis. And finally, the record disputes Chambers' contention that the purpose of the recess was to provide the State with an opportunity to coach and rehabilitate Davis so that he would testify to the State's satisfaction. For instance, after meeting with Davis during the brief recess, Detective Armstrong testified that he and Davis discussed Davis' fears about his personal safety and the safety of his family. Detective Armstrong also testified that Davis told him, "if those two [people in the audience] left the courtroom, he'd come up, testify, and tell the truth." (D.I. 12, at A-17) Davis' reference to "telling the truth" was the only statement concerning the substance of his testimony. Viewing these circumstances in context with the entire record, the court concludes that the Delaware Supreme Court reasonably determined the facts in holding that the sequestration order was not violated and that witness rehabilitation and/or coaching was not the purpose or the result of the recess.

Moreover, because the testimony provided by Davis after the recess would have been admissible under 11 Del. Code Ann. § 3507, Chambers cannot demonstrate that he was prejudiced by the recess and conversation. For all of these reasons, it was reasonable for the Delaware Supreme Court to conclude that the trial judge's decision to recess and permit the conversation was consistent with the broad discretion allowed a trial court in its management of a trial.

In turn, because this decision fell within the trial judge's discretion, there was no manifest necessity for declaring a mistrial or a threat to the ends of public justice in not declaring a mistrial. Consequently, the court also concludes that the Delaware Supreme Court reasonably applied clearly established Federal law in holding that the trial judge did not abuse his discretion in denying Chambers' motion for mistrial.[2] Accordingly, the court will deny claim one because the failure to declare a mistrial did not deprive Chambers of a fair trial.

### B. Claim Two: Failure To Instruct On Accomplice Liability

During the trial, Chambers asked the trial court to instruct the jury to view the testimony of Davis and Haye with caution because the two were accomplices to Graves' murder. The trial judge refused to give the requested instruction, explaining that

> [t]here was no evidence that either Davis or Haye were, in fact, accomplices or their participation in the events of the 27th would make them accomplices. They weren't charged in that fashion and, based on what they testified to, that's the only information we have, what they did. There wouldn't be a basis to find them as accomplices. That's

---

[2]Even if the sequestration order was violated, the Delaware Supreme Court reasonably applied clearly established Federal law in holding that the trial judge did not abuse his discretion in refusing to declare a mistrial, because Chambers has not shown any prejudice resulting such violation. *See Gov't of the Virgin Islands v. Edinborough*, 625 F.2d 472, 473 (3d Cir. 1980)("The failure to sequester witnesses is not, in itself, grounds for reversal unless defendant can show prejudice resulting from the failure to sequester.").

13

the basis I'm denying it. At the same time, the Court will give the general credibility [instruction] that allows counsel to argue that they are biased in some fashion, they had an interest in saying what they said, and basically attacking their credibility on the basis that they were trying to protect their own hides.

*Chambers*, 930 A.2d at 909-10.

On direct appeal, the Delaware Supreme Court rejected Chambers' argument that he was entitled to the requested accomplice credibility instruction as a matter of state law. After noting that "Delaware law defines an accomplice as a person who 'intending to promote or facilitate the commission of the offense . . . solicits, requests, commands, importunes or otherwise attempts to cause the other person to commit it; or aids, counsels or agrees or attempts to aid the other person in planning or committing it," the Delaware Supreme Court held that the witnesses were not accomplices or admitted participants, because there was "no indication [in the record] that either Davis or Haye knew of Chambers' plan." *Id*. at 910. In fact, the two did not discover what had happened until after Chambers shot Graves. *Id*.

The Delaware Supreme Court also rejected Chambers' implicit alternative argument that the "immunity agreement" between Haye and the prosecutor served as a basis for instructing the jury as requested. The "immunity agreement" stated:

> Daniel Haye agrees to give a truthful, accurate and detailed statement regarding his activities on April 26th and April 27th 2003. This statement is to include any knowledge of meetings and/or ongoing problems with Joseph Chambers and Gregory Graves and the disposal of any evidence.
>
> In turn, the State of Delaware through [prosecutor], will not prosecute Daniel Haye as an accomplice for the death of Gregory Graves.

*Id*. at 910. In rejecting Chambers' argument, the Delaware Supreme Court explained that "other jurisdictions have held that such an immunity agreement does not provide a basis for concluding that a witness was either an admitted participant or accomplice in the shooting of Graves. We

14

agree with the rationale of those decisions. Thus, we hold that Haye's immunity agreement did not entitle Chambers to an instruction warning the jury to weigh Haye's and Davis' testimony with greater caution." *Id.* at 910-911.

In claim two of this proceeding, Chambers contends that the trial court erred in refusing to instruct the jury on accomplice credibility in the manner requested by the defense. To the extent Chambers contends that he is entitled to habeas relief because the trial court provided an erroneous jury instruction under Delaware law, he has failed to assert an issue cognizable on federal habeas review. *See Estelle*, 502 U.S. at 72. Rather, the "only question" properly addressed in this proceeding is "whether the [allegedly] ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.*

Given the "wide discretion" provided to courts when charging a jury, there is no *per se* rule requiring a specific instruction in cases involving accomplices and immunized witnesses. *See United States v. Isaac*, 134 F.3d 199, 204 (3d Cir. 1998). Consequently, in most situations, general instructions directing the jury to examine a witness' motivation and credibility are sufficient despite a defendant's request for more specific accomplice and immunized witness instructions. *Id.*

Here, it was reasonable for the trial court to conclude that Haye and Davis were not accomplices, because the evidence presented at trial showed that Haye and Davis did not learn about Chambers' plan until after Chambers shot Graves. Considering Chambers' failure to rebut this factual determination with clear and convincing evidence, the court accepts as correct the trial court's determination that Haye and Davis were not accomplices.

Logically speaking, if Haye and Davis were not accomplices, then the trial court's refusal

15

to instruct the jury on the issue of accomplice credibility constituted a proper exercise of the trial court's broad discretion. On this basis alone, the court could reject Chambers' claim that the trial court's failure to provide such a jury instruction violated his right to due process.

Nevertheless, the court also concludes that the trial court's generalized credibility jury instructions satisfied Chambers' due process rights. The jury was aware of the "immunity agreement" between Haye and the prosecutor, because Haye read the entire immunity agreement to the court and jury during his testimony. (D.I. 12, App. to Appellant's Op. Brief in *Chambers v. State*, No.282,2006 at A-26) Defense counsel brought to the attention of the jury factors suggesting that Davis and Haye were "biased in some fashion [and] had an interest in saying what they said." *Id.* at A-39. And notably, the trial court permitted defense counsel to conduct a vigorous defense and "basically attack[] their credibility on the basis that they were participants in the events and were trying to protect their own hides." *Id.* at A-39. Nothing in this record indicates that the absence of a jury instruction on accomplice credibility so infected the trial with unfairness as to violate Chambers' due process rights. Accordingly, the court will deny claim two.

### C. Claim Three: Equal Protection Rights Violated

In claim three, Chambers contends that the "trial court violated [his] equal protection right under the confrontation clause by allowing out-of-court statements not properly introduced." Chambers presented this argument to the Delaware Supreme Court on post-conviction appeal, but the Delaware Supreme Court denied the claim as procedurally defaulted under Rule 61(i)(3) due to Chambers' failure to raise the argument on direct appeal. *See Chambers*, 2009 WL 3790556, at *2. By applying the procedural bar of Rule 61(i)(3), the

16

Delaware Supreme Court articulated a "plain statement" under *Harris v. Reed*, 489 U.S. 255, 263-4 (1984), that its decision rested on state law grounds. Delaware Superior Court Criminal Rule 61 constitutes an independent and adequate state procedural rule precluding federal habeas review. *See McCleaf v. Carroll*, 416 F. Supp. 2d 283, 296 (D. Del. 2006); *Mayfield v. Carroll*, 2005 WL 2654283 (D. Del. Oct. 11, 2005). Thus, the court cannot review the merits of claim three absent a showing of cause for the default and prejudice resulting therefrom, or upon a showing that a miscarriage of justice will occur if the claim is not reviewed.

Chambers appears to assert ineffective assistance of counsel as cause for his default of claim three. Chambers, however, never presented an ineffective assistance of counsel claim based on counsel's failure to raise claim three in his Rule 61 proceeding. In turn, when he raised the issue of counsel's ineffective assistance in an attempt to establish cause in his subsequent post-conviction appeal, the Delaware Supreme Court refused to consider the argument under Delaware Supreme Court Rule 8. *See Chambers*, 2009 WL 3790556, at *2.

Delaware Supreme Court Rule 8 is an independent and adequate state procedural rule precluding federal habeas review. *See Campbell v. Burris,* 515 F.3d 172, 182 (3d Cir. 2008). By applying the procedural bar of Rule 8, the Delaware Supreme Court articulated a "plain statement" under *Harris* that its decision rested on state law grounds. Consequently, this ineffective assistance of counsel allegation is itself procedurally defaulted, and cannot excuse Chambers' procedural default of claim three. *See Edwards v. Carpenter*, 529 U.S. 446, 453-54 (2000).

In the absence of cause, the court will not address the issue of prejudice. Additionally, the miscarriage of justice exception to the procedural default doctrine is inapplicable, because

17

Chambers has not provided any new reliable evidence of his actual innocence. Accordingly, the court will deny claim three as procedurally barred.

### D. Claim Four: Prosecutorial Misconduct

In claim four, Chambers contends that the prosecutor engaged in misconduct by influencing improper witness testimony which went uncorrected by the court after objection. While Chambers concedes that he did not raise this issue on direct appeal, he asserts that he raised the argument on post-conviction appeal. The record, however, clearly demonstrates that Chambers did not present this prosecutorial misconduct claim on post-conviction appeal. (D.I. 12) Because any attempt to raise such an argument in a new Rule 61 motion would be barred by Delaware Superior Court Rule 61(i)(2) as repetitive and by Rule 61(i)(3) as procedurally defaulted, the court must treat claim four as technically exhausted but procedurally defaulted. Consequently, the court cannot reach the merits of the instant claim absent a showing of cause and prejudice, or a miscarriage of justice.

Chambers does not assert, and the court cannot discern, any cause for his failure to raise the instant claim on direct appeal or in his Rule 61 proceeding. In the absence of cause, the court will not address the issue of prejudice. Additionally, the miscarriage of justice exception to the procedural default doctrine is inapplicable, because Chambers has failed to provide new reliable evidence of his actual innocence. Accordingly, the court will deny claim four as procedurally barred.

## IV. CERTIFICATE OF APPEALABILITY

When a district court issues a final order denying a § 2254 petition, the court must also decide whether to issue a certificate of appealability. *See* 3d Cir. L.A.R. 22.2 (2011). A

18

certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). If a federal court denies a habeas petition on procedural grounds without reaching the underlying constitutional claims, the court is not required to issue a certificate of appealability unless the petitioner demonstrates that jurists of reason would find it debatable: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling. *Id.*

The court has concluded that Chambers' petition fails to warrant federal habeas relief. The court is persuaded that reasonable jurists would not find this conclusion to be debatable. Therefore, the court will not issue a certificate of appealability.

## V. CONCLUSION

For the reasons stated, Chambers' petition for habeas relief pursuant to 28 U.S.C. § 2254 is denied without an evidentiary hearing or the issuance of a certificate of appealability. An appropriate order shall issue.